PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1760
_____

ANTHONY HILDEBRAND,
Appellant

v.

ALLEGHENY COUNTY, a political entity;
ALLEGHENY COUNTY DISTRICT ATTORNEY'S
OFFICE
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-12-cv-01122)
District Judge:  Honorable Arthur J. Schwab
_____

Argued on December 12, 2018
Before:  SMITH, *Chief Judge*, McKEE and FISHER, *Circuit Judges*.

(Opinion Filed: April 24, 2019)

Marjorie E. Crist      **[ARGUED by Video-Conference]**
Crist Law Center
792 Ella Street, Suite 100
Pittsburgh, PA 15243
    *Counsel for Appellant*

Charles J. Porter, Jr.      **[ARGUED by Video-Conference]**
Bernard M. Schneider
Brucker & Porter
180 Fort Couch Road, Suite 410
Pittsburgh, PA 15241
    *Counsel for Appellee*

―――

OPINION OF THE COURT

―――

FISHER, *Circuit Judge*.

In 2013, Anthony Hildebrand sued his former employer for age discrimination in the United States District Court for the Western District of Pennsylvania. When jurisdiction was returned to the District Court in 2015 after an appeal to this Court and the United States Supreme Court, Hildebrand's sole remaining claim stagnated for three years. The docket idled until 2018, shortly after the death of Hildebrand's former supervisor, a key witness. At that point, the employer filed a motion to dismiss for failure to prosecute pursuant to Federal

Rule of Civil Procedure 41(b). The District Court granted the motion and dismissed the suit. We will vacate the dismissal and remand for further proceedings.

I.

In his complaint, Hildebrand alleges that the Allegheny County District Attorney's Office (the "DA's Office") had an established practice of targeting older detectives to force them out of their jobs. He avers that Chief Detective Dennis Logan, Assistant Chief Richard Ealing, and Director of Administration Dawn Botsford engaged in purposeful, discriminatory behavior in the form of disparate treatment, retaliation, and "trumped-up" reasons to fire older detectives. Hildebrand's amended complaint details paragraph after paragraph of alleged insults. For the purposes of this appeal, we need only summarize these copious allegations.

Hildebrand was hired by the DA's Office in 2005, after fifteen years as an undercover narcotics detective with the City of Pittsburgh Police Department. He performed his job responsibilities satisfactorily and without incident for roughly four years. In 2009, Ealing was assigned as his new supervisor. From that time until his termination in February 2011, Hildebrand alleges he was subject to several forms of age-based discrimination.

First, Hildebrand alleges that his supervisors and peers derided him with age-related insults. Among many other taunts, they called him "an 'old man' who would never learn how to use a computer because of his age," App. 26, and stated that he had "Alzheimer's and was too old to comprehend" his orders, App. 27. Ealing either was the source of these insults or failed to stop them, including when Hildebrand submitted complaints.

Second, Hildebrand alleges that his workload changed for the worse due to his age. He alleges that Ealing divided his

3

responsibilities among younger investigators and assigned Hildebrand meaningless busywork that his younger peers did not have to perform. He further claims that he was deprived of overtime hours, counter to a tradition of assigning those hours to detectives with seniority, like Hildebrand.

Third, Hildebrand claims that his supervisors subjected his work to heightened scrutiny, questioning him extensively about his cases in a way that the younger detectives were not questioned, and trumping up false disciplinary charges that were meant to create a paper trail to support his termination.

Eventually, Hildebrand was demoted from a narcotics-division detective to general investigations and was relocated to a space with no desk, no working computer, and no phone. When Hildebrand asked why, Ealing became combative and countered that neither he nor Chief Detective Logan had to answer any of the "old son of a bitches [sic]" questions. App. 34-35. Hildebrand alleges that Ealing told him that he had gotten rid of old detectives previously and he was doing the same to Hildebrand. Hildebrand further asserts that Ealing and Logan obstructed him from filing a grievance regarding his demotion.

In February 2011, Hildebrand was suspended for five days without pay when Ealing and Logan accused him of committing several violations, including using a DA's Office vehicle for personal use without permission—something that younger detectives regularly did without repercussions. Hildebrand alleges that several of the other supposed violations "never occurred." App. 43.

Hildebrand appealed his suspension to the Director of Administration, Dawn Botsford, who met with him for twenty minutes and did not allow him to present any evidence. A union meeting was held to vote on whether to grieve Hildebrand's suspension. Logan appeared at the meeting—allegedly only

4

the second time in his career that he attended such a meeting—for the alleged purpose of "intimidat[ing] any union members who supported Hildebrand." App. 44. The union voted not to appeal Hildebrand's suspension. Hildebrand was terminated in February 2011.

Hildebrand alleges the negative treatment continued after termination. He applied for payment for his unused sick days, "which was the practice of the [DA's Office]," but was denied. App. 44. Hildebrand also alleges that Ealing tried to obstruct his application for a private investigator license.

Hildebrand filed a complaint with the Equal Employment Opportunity Commission. The EEOC sent him a Determination and Right to Sue Notice. He then filed a complaint in the District Court against Allegheny County and the DA's Office, alleging violations of the ADEA, 29 U.S.C. § 621, *et seq.*, constitutional violations under 42 U.S.C. § 1983, and several state law claims. The Defendants moved to dismiss Hildebrand's ADEA claim for timeliness and his constitutional and state law claims for inadequate pleading. The District Court granted the motion, Hildebrand appealed, and this Court affirmed the dismissal of the § 1983 claims and reversed as to the ADEA claim. *Hildebrand v. Allegheny Cty.*, 757 F.3d 99 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 1398 (2015).[1] Hildebrand filed a petition for certiorari regarding the dismissed claims, which the Supreme Court denied.

While his petition was pending, the DA's Office filed a motion to dismiss the ADEA claim pursuant to Federal Rules

---

[1] Since Allegheny County was only alleged to have violated § 1983, it was dismissed from the action.

5

of Civil Procedure 12(b)(1), 12(b)(6),[2] and 12(b)(7). Hildebrand filed a motion to stay the motion to dismiss "until appellate proceedings [were] concluded," which was granted. App. 118. Concurrently, Hildebrand also filed a substantive response to the pending motion to dismiss "so that it could be adjudicated upon" resolution of the petition for certiorari. Appellant's Br. 3.

After the Supreme Court denied Hildebrand's petition for certiorari and jurisdiction was returned to the District Court in February 2015, the docket remained administratively closed due to clerical error. No action was taken by the court or either party for the next three years. The court did not lift the stay, adjudicate the fully-briefed motion to dismiss, or schedule a status conference. Hildebrand did not follow up by filing a motion or making any other contact with the District Court. The DA's Office also did not follow up on its pending motion to dismiss. Only after the death of one of its key witnesses, Ealing, did the DA's Office file a motion to dismiss for failure to prosecute, pursuant to Federal Rule of Civil Procedure 41(b). The District Court granted the motion, and Hildebrand now appeals, arguing that the District Court abused its discretion.

## II.

The District Court had federal question jurisdiction over Hildebrand's ADEA and § 1983 claims and supplemental

---

[2] The DA's Office moved to dismiss the remaining state law claims—not the ADEA claim—pursuant to Rule 12(b)(6). The DA's Office stated it was unclear at the time it filed the motion whether "the Third Circuit's order has resurrected the Pennsylvania law claims," but if it did, the DA's Office renewed its previous Rule 12(b)(6) motion to dismiss those claims. App. 98.

jurisdiction over his related state law claims. 28 U.S.C. §§ 1331, 1367. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. **"**We review a District Court's decision to dismiss a plaintiff's case pursuant to Federal Rule of Civil Procedure 41(b) for an abuse of discretion." *Briscoe v. Klaus*, 538 F.3d 252, 257 (3d Cir. 2008) (citing *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002)).

### III.

A defendant may move to dismiss a claim against him where "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order." Fed. R. Civ. P. 41(b). A district court should consider six factors when determining whether to dismiss a case under Rule 41(b). *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). The court abuses its discretion where it fails to properly consider and balance those factors, namely:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Id.* (emphasis omitted). The record must support the District Court's findings on the six factors. *Id.* The court found that five of the factors weighed in favor of dismissal and one factor, willful or bad faith conduct, was neutral.

This Court has acknowledged that "we do not have a

7

'magic formula' or 'mechanical calculation' to determine whether a District Court abused its discretion in dismissing a plaintiff's case." *Briscoe*, 538 F.3d at 263 (quoting *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992)). None of the *Poulis* factors is alone dispositive, and it is also true that not all of the factors need to be satisfied to justify dismissal of a complaint for lack of prosecution. *Id*. Dismissal is a sanction rightfully in the district courts' toolbox, and this Court "has not hesitated to affirm the district court's imposition of sanctions, including dismissals in appropriate cases." *Poulis*, 747 F.2d at 867 n.1. However, dismissal must be appropriate.

The Supreme Court describes dismissal with prejudice as an "extreme" sanction. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). We too have repeatedly acknowledged that "dismissals with prejudice or defaults are drastic sanctions" that "must be a sanction of last, not first, resort." *Poulis*, 747 F.2d at 867, 869; *see also Briscoe*, 538 F.3d at 258; *Emerson*, 296 F.3d at 190. If the case is close, "doubts should be resolved in favor of reaching a decision on the merits." *Adams v. Trs. of the N.J. Brewery Emps.' Pension Tr. Fund,* 29 F.3d 863, 870 (3d Cir. 1994) (quoting *Scarborough v. Eubanks*, 747 F.2d 871, 878 (3d Cir. 1984)). Without a doubt, cases should be decided on the merits barring substantial circumstances in support of the contrary outcome.

The District Court failed to mention this strong policy favoring decisions on the merits at any point in its memorandum opinion. While that alone is not an abuse of discretion, we are not convinced that the court had this policy in mind when it analyzed the *Poulis* factors and dismissed Hildebrand's case with prejudice.

A. *Application of the* Poulis *factors*

1. The extent of the party's responsibility

The District Court found Hildebrand personally responsible for the three-year hiatus, stating that, as the person with the "most at stake," App. 10, it is implausible that Hildebrand would not have asked his counsel about the status of his case. However, there is no record evidence of Hildebrand's involvement or lack thereof, so this conclusion was conjectural and not based on the record. There is no evidence that Hildebrand was personally responsible for the delay, and the District Court erred in holding him so. The District Court relied on the principle that it is not unjust to the client to dismiss his case because of his counsel's "unexcused conduct." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633 (1962). However, this Court has "increasingly emphasized visiting sanctions directly on the delinquent lawyer, rather than on a client who is not actually at fault." *Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 807 (3d Cir. 1986) (considering dismissal as discovery sanction under Fed. R. Civ. P. 37); *see also Burns v. MacMeekin* (*In re MacMeekin*), 722 F.2d 32, 35 (3d Cir. 1983) (requiring district courts to consider and rule out alternative remedies because "[t]he brunt of the order [to dismiss] falls on plaintiffs, who have been deprived of the opportunity to litigate their case on the merits, when the only culpable party may well be their attorney"). *Poulis* is one example of this emphasis. There, we distinguished between a party's responsibility for delay and counsel's responsibility. 747 F.2d at 868. Because the attorney "acknowledged the delays were his responsibility," caused by personal illness and family matters, we concluded that the personal responsibility factor did not weigh in favor of dismissal. *Id.*; *see also Carter*, 804 F.2d at 806-07 (finding plaintiff not personally responsible even when he knew of his attorney's dereliction). "[I]n

9

determining whether dismissal is appropriate, we look to whether the party bears personal responsibility for the action or inaction which led to the dismissal." *Adams*, 29 F.3d at 873. We have focused on the plaintiff's personal responsibility in multiple Rule 41 cases. *See Dunbar v. Triangle Lumber and Supply Co.*, 816 F.2d 126, 128-29 (3d Cir. 1987) (vacating and remanding after Rule 41 dismissal because, although attorney's conduct rose to "the level of willfulness and contumaciousness necessary to support the sanction of dismissal," there was no evidence that the plaintiff was aware of "her counsel's defaults or otherwise bore some personal responsibility for his professional irresponsibility"); *Briscoe*, 538 F.3d at 258-59 (vacating and remanding after Rule 41 dismissal because, even though plaintiff represented himself, there was insufficient evidence that his failure to comply was his own doing, as opposed to the result of an external factor he could not control).

Conversely, this Court has held corporate plaintiffs personally responsible for the dilatory actions of their in-house counsel. *Adams*, 29 F.3d at 873. In *Adams*, the corporate plaintiff was personally responsible because its in-house counsel's actions did not reflect "the sympathetic situation of an innocent client suffering the sanction of dismissal due to dilatory counsel whom it hired to represent it." *Id.* at 873 (internal citation omitted). As counsel and client were essentially the same entity, the plaintiff was not permitted to hide behind ignorance of its counsel's dilatoriness.

Because Hildebrand is a natural person represented by private counsel, not a corporation represented by its own employees, the facts of this case are more like *Dunbar* and *Briscoe* than *Adams* as they relate to the personal responsibility *Poulis* factor. The District Court conjectured that, because Hildebrand was unemployed, it was "implausible that [he]

10

would not have at least inquired of his counsel over the last three years . . . as to why his ADEA claim was not moving forward." App. 10. Hildebrand's unemployment and his likely desire to have his case resolved do not automatically indicate that he and his counsel discussed why his case had not proceeded. It is entirely possible that Hildebrand, a non-lawyer, was patiently awaiting the resolution of what he assumed were lengthy appeals. The court did not base its conclusion that Hildebrand knew about his counsel's delay on record evidence, and instead, it resolved doubts about Hildebrand's personal involvement against a decision on the merits. Without record evidence supporting the notion that Hildebrand was personally responsible for the delay, the District Court should not have weighed this factor in favor of dismissal.

### 2. Prejudice to the adversary

The District Court appropriately concluded that Ealing's death, which occurred near the end of the three-year hiatus, prejudiced the DA's Office. The resulting loss of evidence is important when considering the appropriateness of dismissal, but is not dispositive.

Prejudice to the adversary is a particularly important factor in the *Poulis* analysis, and evidence of "true prejudice . . . bear[s] substantial weight in support of a dismissal." *Scarborough*, 747 F.2d at 876. Relevant examples of prejudice include "the irretrievable loss of evidence[] [and] the inevitable dimming of witnesses' memories." *Id.* The bar is not so high that a party needs to show "irremediable harm" for the prejudice to weigh in favor of dismissal. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 222 (3d Cir. 2003) (citation omitted). An inability to prepare "a full and complete trial strategy is sufficiently prejudicial." *Id.*

11

The DA's Office argues that allegations against Ealing were at the heart of Hildebrand's claims and, therefore, Ealing's assistance and availability were essential to its preparation of an adequate trial strategy. Hildebrand's own allegations make it clear that Ealing was a key witness. Hildebrand argues that the contention that Ealing was at the center of his claims against the DA's Office is not supported by the pleadings. He points to several sources of evidence that he believes would enable the DA's Office to "fully defend" itself without Ealing's testimony: the testimony of Botsford and Logan, who were involved in Hildebrand's termination and allegedly worked with Ealing to force out older employees; witnesses who heard Ealing's alleged public insults; and written documentation from and testimony of witnesses to official meetings where Hildebrand attempted to file grievances.

However, even assuming all of that evidence exists and is available, several of Hildebrand's allegations involve interactions with Ealing alone. These include several instances where Ealing allegedly made age-based insults, reassigned Hildebrand's work responsibilities, and informed Hildebrand he was on a path toward termination due to his age. Ealing's death amounts to an irremediable loss of evidence. While other evidence may be available to the DA's Office, that evidence cannot replace Ealing for the purposes of preparing a full and complete trial strategy. The witnesses whom the parties rely on to fill the gaps will inevitably have dimmed memories from the delay. And, as the District Court points out, Ealing's death undermines the jury's opportunity to weigh the credibility of Hildebrand's accusations versus Ealing's demeanor and responses in open court. This prejudice to the DA's Office bears substantial weight in favor of dismissal, but it is not

dispositive of the appropriateness of imposing the harshest sanction available.[3]

### 3. History of dilatoriness

The District Court did not act outside its discretion in determining that the timeline—a three-year hiatus in five and a half years of litigation—weighs in favor of dismissal. However, the weight the District Court gave to this factor should have been mitigated by Hildebrand's otherwise responsible litigation history.

"[E]xtensive or repeated delay or delinquency constitutes a history of dilatoriness . . . ." *Adams*, 29 F.3d at 874. Normally, "conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness,'" *Briscoe*, 538 F.3d at 261 (quoting *Scarborough*, 747 F.2d at 875). Most cases where the court found a history of dilatoriness involved repeated delay. *See, e.g.*, *Ware*, 322 F.3d at 224 (finding a history of dilatory conduct where plaintiffs "failed repeatedly" to provide a damages calculation over a five-year period); *Emerson*, 296 F.3d at 191 (finding a history of dilatory conduct where plaintiff made multiple requests for stays and failed to meet deadlines).

In addition to repeated acts, we have also held that "extensive" delay can create a history of dilatoriness. *Adams*, 29 F.3d at 874. "'[F]ailure to prosecute' under the Rule 41(b) does not mean that the plaintiff must have taken any positive steps to delay the trial . . . . It is quite sufficient if he does

---

[3] It is noteworthy that the District Court observed that Hildebrand also suffered prejudice as a result of the lengthy delay: "[t]he loss of Eagling [sic] is detrimental to both the Plaintiff and his ability to prove the specific acts of discrimination which he alleges, as well as the Defendant's defense of this case." App. 12.

nothing . . . ." *Id.* at 875 (citation omitted). While extensive delay may weigh in favor of dismissal, "a party's problematic acts must be evaluated in light of its behavior over the life of the case." *Id.* For instance, because the plaintiff in *Adams* had litigated the case responsibly for ten years prior to the hiatus, the delay was "somewhat mitigated" and "weigh[ed] toward, but [did] not mandate, dismissal." *Id.*

Hildebrand's case is like *Adams*; while Hildebrand had not litigated his case responsibly for as long as ten years, he had done so for nearly two and a half years prior to the delay. The District Court appropriately concluded that the extensive delay weighed in favor of dismissal. However, Hildebrand's conduct has not been delinquent at any other point, and the fact that his delay was an isolated incident—albeit, a three-year-long one—should serve to mitigate the weight the District Court placed in favor of dismissal.

### 4. Willful or bad-faith conduct

The District Court found that Hildebrand did not cause the delay willfully or in bad faith. Neither party contests this point. The court concluded that this factor was neutral in the *Poulis* analysis. Because the delay was not effectuated by a self-serving or bad-faith tactic, the court should have weighed this factor against dismissal.

In evaluating this factor, a court should look for "the type of willful or contumacious behavior" that can be characterized as "'flagrant bad faith,'" such as failing to answer interrogatories for nearly a year and a half, demanding numerous extensions, ignoring admonitions by the court, and making false promises to correct delays. *Scarborough*, 747 F.2d at 875 (citing *Nat'l Hockey League*, 427 U.S. at 643). "Willfulness involves intentional or self-serving behavior." *Adams*, 29 F.3d at 875. A lengthy delay reflects "inexcusable

14

negligent behavior," *id.* at 876, but that behavior alone does not rise to the level of willfulness or bad faith.

In this case, there is no evidence on the record that the three-year hiatus was part of any bad-faith tactic by Hildebrand. Hildebrand's counsel blamed the fact that the docket remained closed after the appellate proceedings concluded and stated that she thought the DA's Office's motion to dismiss from before the appeal was still in line to be adjudicated. The delay was caused by administrative confusion as much as anything else. While these excuses do not fully explain why counsel did not follow up with the District Court, they at least offer some insight into how the delay happened, unlike *Adams*, where the plaintiff offered no explanation for the delay. *Id.* at 876. Because the harsh sanction of dismissal should serve to deter bad faith or self-serving behavior, and because of our policy of favoring decisions on the merits, the fact that the delay was not effectuated willfully or in bad faith should weigh against dismissal.

5.     Effectiveness of sanctions other than dismissal

The District Court offered only one paragraph on alternative sanctions in which it considered fines as the only alternative, but dismissed them as ineffective to cure Ealing's absence at trial.

A district court must consider alternative sanctions before dismissing a case with prejudice. *Briscoe*, 538 F.3d at 262. "Alternatives are particularly appropriate when the plaintiff has not personally contributed to the delinquency," as is the case here. *Poulis*, 747 F.2d at 866 (citation omitted). It bears repeating that important in the overall *Poulis* analysis, and particularly in the consideration of alternative sanctions, is that "district courts should be reluctant to deprive a plaintiff of the right to have his claim adjudicated on the merits." *Adams*,

29 F.3d at 876 (quoting *Titus v. Mercedes Benz*, 695 F.2d 746, 749 (3d Cir. 1982)). We have repeatedly stated that "[d]ismissal must be a sanction of last, not first, resort." *Id.* at 878 (quoting *Poulis*, 747 F.2d at 869); *see also Emasco Ins. Co. v. Sambrick*, 834 F.2d 71, 75 (3d Cir. 1987); *Carter*, 804 F.2d at 807.[4]

While district courts need not put on the record consideration of every possible sanction before dismissing a case with prejudice, the District Court's analysis is insufficient

---

[4] Several of our sister circuits echo the importance of thorough consideration of alternative sanctions before dismissal. *See, e.g.*, *Peterson v. Archstone Cmtys. LLC*, 637 F.3d 416, 418 (D.C. Cir. 2011) (emphasizing the importance of trying "less dire alternatives" before imposing the harsh sanction of dismissal); *3 Penny Theater Corp. v. Plitt Theatres, Inc.*, 812 F.2d 337, 339 (7th Cir. 1987) ("A Rule 41(b) dismissal is appropriate when . . . other sanctions have proved unavailing." (citation omitted)); *Hamilton v. Neptune Orient Lines, Ltd.*, 811 F.2d 498, 500 (9th Cir. 1987) ("While there is no requirement that every conceivable sanction be examined, meaningful alternatives must be explored . . . . Where there is no indication that such alternative actions were weighed and found wanting, a dismissal pursuant to Rule 41(b) is more difficult to sustain." (citations omitted)); *Canada v. Mathews*, 449 F.2d 253, 255 (5th Cir. 1971) (per curiam) ("[W]e have consistently held that a dismissal with prejudice is warranted only in extreme circumstances and only after the Trial Court, in the exercise of its unquestionable authority to control its own docket, has resorted to the wide range of lesser sanctions which it may impose upon the litigant or the derelict attorney, or both." (internal quotation marks and footnotes omitted)).

to honor our longstanding tradition of favoring decisions on the merits. The court focuses its brief analysis on fully resolving the problems caused by the hiatus and Ealing's death, *see* App. 13, even though we have never held that alternative sanctions need be completely ameliorative. In most cases, including here, placing the aggrieved party in the position it was in prior to the dilatory behavior would be impossible. Rather, alternative sanctions need only be effective toward mitigating the prejudice caused by dilatory behavior or delinquency. In this case, evidentiary or other sanctions may have been sufficient. While it is generally in the District Court's discretion to consider whether those or other sanctions would be effective, it failed to offer any such analysis. The court should have more fully considered whether sanctions other than fines may have been effective.

6.     Meritoriousness of Hildebrand's ADEA claim

The District Court altogether failed to address the meritoriousness of Hildebrand's ADEA claim. In a single paragraph, the court examined the meritoriousness of the wrong "claim[] or defense," *Poulis*, 747 F.2d at 869-70, focusing solely on Hildebrand's defense of the DA's Office's Rule 41(b) motion to dismiss. *See* App. 13-14 ("Because [Hildebrand] failed to offer the [c]ourt a plausible explanation as to why he and his attorney did nothing for three years, the [c]ourt has been given no defense to weigh on [Hildebrand's] behalf. Thus, this factor weighs in favor of dismissal."). This analysis misses the mark.

The standard for determining whether a plaintiff's claims are meritorious "is moderate." *Adams*, 29 F.3d at 876. "[W]e do not purport to use summary judgment standards. A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would

17

support recovery by plaintiff or would constitute a complete defense." *Poulis*, 747 F.2d at 869-70; *see also Briscoe*, 538 F.3d at 263 ("[W]e use the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim." (citing *Poulis*, 747 F.3d at 869-70)).

Under *Poulis*, the District Court was required to examine whether Hildebrand's ADEA claim had merit. *See Briscoe*, 538 F.3d at 263; *Adams*, 29 F.3d at 876-77. Yet, the court did not make any reference to the ADEA claim whatsoever, much less analyze its merits. If the District Court had evaluated the amended complaint for meritoriousness and applied the correct standard, it would have found that Hildebrand's claim was meritorious.

Hildebrand alleges sufficient facts to plausibly state an ADEA claim, which is evident from even a glance at the amended complaint. He adequately alleges a hostile work environment, including page upon page of disparate treatment and adverse employment decisions based on his age. He claims he was retaliated against for complaining about the negative treatment, and he alleges his age was the motivation for his termination. Its meritoriousness is further evidenced by the fact that the DA's Office filed three motions to dismiss in this case, none of which argued that the ADEA claim was not pled with the specificity needed to survive a Rule 12(b)(6) motion to dismiss. *See* District Ct. Dkt. Nos. 8-9, 17-19, 33-34.

### B. Balancing of the Poulis *Factors*

Because there is no "magic formula" or "mechanical calculation" in evaluating a Rule 41(b) motion to dismiss, we generally afford great deference to district courts' discretion. However, we have never upheld a court's dismissal when it was supported by an inadequate foundation on even one of the *Poulis* factors. *See, e.g.*, *Adams*, 29 F.3d at 874, 876, 878 (vacating dismissal after a misapplication of three factors);

18

*Carter*, 804 F.2d at 808 (vacating dismissal in part after a misapplication of one factor); *Scarborough*, 747 F.2d at 876-77 (vacating dismissal after a misapplication of two factors); *Titus*, 695 F.2d 747 (vacating dismissal after a misapplication of one factor). Where it is apparent that a district court misstated the law, relied upon findings that were not supported by the record, or did not consider the motion in light of our strong policy in favor of deciding cases on the merits, we must conclude that it abused its discretion. Here, the District Court committed all three errors.

The District Court dismissed Hildebrand's case pursuant to Rule 41(b) after concluding that five factors weighed in favor of dismissal. However, its conclusions regarding three of those five factors rested on inadequate foundations. The court held that Hildebrand was personally responsible for the delay when no record evidence exists to support that notion. Rather than resolving doubts "in favor of reaching a decision on the merits," *Emerson*, 296 F.3d at 190, the District Court made unsupported assumptions about Hildebrand's personal involvement and responsibility and resolved doubts in favor of dismissal. The court offered perfunctory consideration of whether alternative sanctions would be effective and appropriate here, flying in the face of our policy of choosing dismissal as a last resort. And, finally, the District Court offered no consideration of whether Hildebrand's ADEA claim was meritorious, instead applying an inapposite standard to that factor. Additionally, the court found that the willfulness or bad faith factor was neutral in the absence of any bad faith or self-serving action. It should have concluded that where no bad faith or willfulness exists, that factor weighs against dismissal.

The court was correct in its analysis that the DA's Office was prejudiced by the delay because of Ealing's death

and that Hildebrand's long delay supports a finding of a history of dilatoriness in light of *Adams*. However, we will not postulate whether the District Court would have still ordered dismissal, or whether that dismissal would have been appropriate, where only two factors weighed in favor of dismissal, including prejudice, which bears "substantial weight in support of a dismissal." *Scarborough*, 747 F.2d at 876. Rather, "[t]he scope of *our* review is restricted to determining whether the district court abused *its* discretion. How we imagine we might have exercised our own discretion had we been in the district court judge's robe is entirely irrelevant." *Mindek*, 964 F.2d at 1373-74.

Where, as here, a district court fails to apply the correct standard, including a failure to consider the *Poulis* factors in light of our clear and repeated instruction to resolve doubt in favor of a decision on the merits, we must conclude that the court abused its discretion.

IV.

For the foregoing reasons, we will vacate the District Court's order of dismissal and remand for further proceedings consistent with this opinion.